# United States Court of Appeals
## For the First Circuit

No. 14-2188

LIMOLINER, INC.,

Plaintiff, Appellant,

v.

DATTCO, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Jennifer C. Boal, U.S. Magistrate Judge]

Before

Kayatta, Stahl, and Barron,
Circuit Judges.

Robert E. Curtis, Jr., with whom James S. Singer and Rudolph Friedmann LLP were on brief, for appellant.
Christopher S. Williams, with whom Williams & Associates was on brief, for appellee.

December 23, 2015

**BARRON**, <u>Circuit Judge</u>.  This appeal arises out of a suit over repair work on a luxury motor coach.  The company that owns the vehicle, LimoLiner, Inc., contracted with an automotive repair company, Dattco, Inc., to do the work.  The parties do not contest the finding below that Dattco breached the repair contract by failing to do all of the work that LimoLiner had requested.  But LimoLiner does appeal the rulings below that Dattco may not be held liable under a Massachusetts regulation for certain actions and omissions that occurred on the job; that Dattco did not breach the parties' oral contract to make the repairs in a timely manner; and that Dattco owes damages only for the loss of use of the vehicle for one limited period of time.

We certify a question concerning the Massachusetts regulation's intended scope to the Supreme Judicial Court of Massachusetts, and we thus do not decide the merits of LimoLiner's regulatory claims.  We otherwise affirm.

**I.**

LimoLiner is a Massachusetts corporation that owns and operates a fleet of luxury motor coaches that are known as "Liners."  Dattco is a Connecticut corporation that repairs and services motor vehicles, including buses and coaches.  The undisputed facts are as follows.

On May 30, 2011, two LimoLiner employees met with two Dattco representatives to discuss the possible need to repair one

of the Liners, Liner 3001. That vehicle had been out of service for about a year and needed extensive repair work.

At the May 30th meeting, Dattco orally agreed to repair Liner 3001 by, among other things, replacing or repairing a part of the vehicle called the inverter. The parties agreed that Liner 3001 would be towed to Dattco's facility in Massachusetts for inspection and that Dattco would provide a list of repairs following inspection. During that meeting, LimoLiner's general manager told Dattco's sales manager that LimoLiner wanted Liner 3001 to be repaired "as soon as possible."

Following that meeting, Dattco generated a list of repairs, though that list did not include the inverter work that the Magistrate Judge found that Dattco had actually agreed to perform. The two parties used this list to divide the responsibility for each repair between each party. Dattco was to undertake the bulk of the repair work with the rest left for LimoLiner's own mechanics.

After Dattco took hold of Liner 3001, LimoLiner became concerned about the time Dattco was taking to repair the vehicle. On August 4, 2011, at an in-person meeting, the representatives from LimoLiner demanded compensation from Dattco for the monetary losses LimoLiner claimed it had sustained up to that point as a result of its inability to use Liner 3001. On August 8, 2011, LimoLiner followed up by letter and "complained about the level of

attention, time and resources assigned to the job" by Dattco and specifically demanded $42,000 in compensation. LimoLiner, Inc. v. Dattco, Inc., No. 11-11877-JCB, 2014 WL 4823877, at *4 (D. Mass. Sept. 24, 2014). That letter also contained an offer to pay Dattco a certain amount for its services if Dattco delivered Liner 3001 by 5:00 p.m. on Friday, August 12, 2011.

Dattco responded to that letter by email on August 25, 2011. In doing so, Dattco informed LimoLiner that Liner 3001 was ready for pickup. Attached to the email was an invoice for $10,404.

LimoLiner refused to pay, but offered to put the money in escrow in exchange for the return of Liner 3001. Dattco did not accept that offer.

On October 5, 2011, LimoLiner filed this action in Massachusetts Superior Court. The suit alleged breach of contract, misrepresentation, negligence, replevin, and violation of 940 C.M.R. § 5.05, a regulation promulgated by the Massachusetts Attorney General pursuant to Mass. Gen. Laws ch. 93A, § 2 ("Chapter 93A"). LimoLiner also moved for an order directing Dattco to return Liner 3001.

The court issued the requested order after first requiring LimoLiner to submit a $10,404 deposit to the Clerk's Office. Dattco complied with the court's order and returned Liner 3001 to LimoLiner on October 12, 2011.

- 4 -

Dattco removed the case to federal district court on the basis of diversity jurisdiction, answered, and counterclaimed for breach of contract and quantum meruit. A Magistrate Judge, presiding by consent over a bench trial, found that Dattco had expressly agreed to repair Liner 3001's inverter and breached the agreement by failing to make that repair.[1] The Magistrate Judge awarded LimoLiner $35,527.89 in damages for that breach. The Magistrate Judge ruled for Dattco on all of LimoLiner's other claims, including the remaining contract claims and the regulatory claims. The Magistrate Judge also awarded Dattco $10,404 in damages on its quantum meruit claim, thereby reducing LimoLiner's total recoverable damages to $25,123.89.

LimoLiner appeals on three grounds. First, LimoLiner contends that the Magistrate Judge erred when she held, as a matter of law, that 940 C.M.R. § 5.05 does not apply to this dispute because the regulation does not apply to disputes between two businesses. Second, LimoLiner contends that the Magistrate Judge committed clear error when she found both that the parties did not agree to an expedited term for performance and that Dattco did not breach the parties' implicit agreement to complete the work within

---

[1] Pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, the instant case was referred and reassigned in the district court, with the parties' consent, to a Magistrate Judge for all purposes, including trial, the entry of judgment, and all post-trial proceedings.

a reasonable period of time. Third, LimoLiner contends that the Magistrate Judge clearly erred in awarding damages that provide compensation only for one portion of the time that LimoLiner was without the use of Liner 3001.

**II.**

We start with LimoLiner's regulatory claims. Chapter 93A generally prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2(a). The statute also empowers the Attorney General of Massachusetts to issue regulations the violation of which constitutes a per se violation of Chapter 93A. See id. § 2(c); 940 C.M.R. § 3.16(3).

LimoLiner's regulatory claims rely on one of those regulations, 940 C.M.R. § 5.05. It provides, among other things, that "[i]t is an unfair or deceptive act or practice for a repair shop, prior to commencing repairs on a customer's vehicle, to fail to record in writing . . . [t]he specific repairs requested by the customer . . . ." Id. § 5.05(2)(e).

The Magistrate Judge found that Dattco failed to include the inverter in the written list of repairs it prepared prior to working on Liner 3001, even though LimoLiner had previously requested that specific repair. LimoLiner thus contends that Dattco plainly violated the regulation in this and other respects. But the Magistrate Judge ruled that § 5.05 does not apply to

business-to-business transactions and instead regulates transactions only between businesses and individual consumers. For that reason, the Magistrate Judge rejected LimoLiner's claim that Dattco violated the regulation.

Neither the Massachusetts Supreme Judicial Court ("SJC") nor this Circuit has construed this regulation before. But the SJC has held that a subsection of an arguably analogous Chapter 93A regulation is inapplicable to corporate consumers. See Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp., 640 N.E.2d 1101, 1102 (1994) (holding that 940 C.M.R. § 3.08(2) does not apply to business-to-business transactions). And we have followed Knapp in concluding that a different Chapter 93A regulation also does not apply to business-to-business disputes. See Baker v. Goldman, Sachs & Co., 771 F.3d 37, 56-57 (1st Cir. 2014) (holding, on the basis of Knapp, that 940 C.M.R. § 3.16 does not apply to business-to-business transactions).

In Knapp, the SJC addressed 940 C.M.R. § 3.08(2), a provision that makes it an unfair and deceptive act or practice "to fail to perform or fulfill any promises or obligations arising under a warranty." 940 C.M.R. § 3.08(2). Knapp held that it was "reasonably clear that, in drafting the regulation, the Attorney General had in mind protection for consumers," meaning individuals. Knapp, 640 N.E.2d at 1105.

- 7 -

The SJC reached that conclusion by first noting that § 3.08(2) was promulgated in 1971, the year before Chapter 93A was amended to give corporate entities a right of action under the statute. Id. at 1103, 1105. The SJC then examined § 3.08 "as a whole" and noted that the other two subsections of the regulation explicitly referred to "consumers" and "concern[ed] matters generally involved in consumer transactions," such as "the obligation[] to provide the customer with a written and accurate estimate of the anticipated cost of repairs[] and a prohibition on charging for repairs which the customer has not authorized." Id. at 1105. The SJC thus concluded that subsection (2) of the regulation was "not intended to encompass a contract dispute between businessmen" because "the bulk of the regulation applie[d] only to consumers and their interests, and subsection (2) contain[ed] no language suggesting that it was meant to apply to a broader class of persons or interests." Id.

Dattco contends -- and the Magistrate Judge agreed -- that § 5.05 is just like the subsection of the regulation construed in Knapp. Although § 5.05 does not use the term "consumer," it does set out obligations very similar to those that the Knapp court described as being "generally involved in consumer transactions." See 940 C.M.R. § 5.05 (referring to repairs and service made for the benefit of the "customer" and with respect to the "customer's" vehicle); 940 C.M.R. § 5.05(2)(e) (obligating a repair shop to

- 8 -

make a written record of all specific repairs requested by the customer before commencing repair work); id. § 5.05(3) (prohibiting a repair shop from charging for repairs that have not been authorized by the customer); see also Knapp, 640 N.E.2d at 1105 n.6 (noting in the context of § 3.08 that "consumer" and "customer" are used interchangeably). And the sample waiver form included in the text of the regulation -- provided to give repair shops the option to ask customers to authorize repairs in advance -- is written in the first person, as if on behalf of an individual rather than a business. See 940 C.M.R. § 5.05(3)(d) ("I understand that I have the right to know before authorizing any repairs what the repairs to my car will be and what their cost will be. You need not obtain approval from me for repairs or inform me prior to performing repairs what the repairs are or their cost, if the total amount for repairs does not exceed [a specified amount].").

Nonetheless, unlike the regulation considered in Knapp, § 5.05 is part of the Massachusetts Attorney General's "motor vehicle" regulations. Thus, unlike the regulation considered in Knapp, § 5.05 is not part of the general "consumer protection" regulations. And, as LimoLiner contends, the terms of § 5.05 could be read to more directly encompass acts taken in the business-to-business context than could the terms of the subsection of the regulation considered in Knapp. See generally id. § 5.05

- 9 -

(proscribing unfair or deceptive acts or practices in relation to the "customer"); id. § 5.01 (defining "customer" as "any person who has [or seeks to have] repairs, service or maintenance performed . . . by a repair shop on a motor vehicle"); id. (defining "person" as a "corporation," among other things).

Moreover, the timing of the promulgation of § 5.05 differs from the timing of the promulgation of § 3.08(2). Section 5 of the regulations -- and thus this regulation -- became effective in 1976. That was four years after corporations were granted a right of action under Chapter 93A. Thus, the timing-based reason the SJC gave in Knapp for construing the reach of that regulation not to encompass business-to-business disputes is not present here.

The SJC has not had occasion to provide additional guidance since Knapp about whether regulations promulgated under Chapter 93A apply to business-to-business disputes. We thus conclude that this case presents "close and difficult legal issues" for which there is no controlling Massachusetts precedent. Easthampton Sav. Bank v. City of Springfield, 736 F.3d 46, 51 (1st Cir. 2013). Moreover, this case has the potential to impact numerous business-to-business transactions concerning motor vehicle repair and service, implicates competing policy interests, and involves an area of traditional state authority. See id. at 52-53. And, finally, resolution of the regulation's scope "may be

- 10 -

determinative of" LimoLiner's regulatory claims.  See Mass. S.J.C.
R. 1:03.  Accordingly, we certify the following question to the
SJC, as the SJC permits us to do in these circumstances, see id.:

> Does 940 C.M.R. § 5.05 apply to transactions in which
> the customer is a business entity?

The Clerk of this court is directed to forward to the
Massachusetts Supreme Judicial Court, under the official seal of
this court, a copy of the certified question and our opinion in
this case, along with copies of the briefs and appendices filed by
the parties.  We retain jurisdiction over this appeal, and the
question of whether Dattco violated § 5.05, pending resolution of
the certified question.

## III.

With respect to LimoLiner's contract claims, the company
contends that the Magistrate Judge clearly erred in finding that
the parties did not agree to an expedited term of performance.
LimoLiner also contends that, in any event, Dattco breached the
agreement by failing to perform within a reasonable time.  We
consider each argument in turn.

## A.

The contract between the parties was an oral one.  The
parties do not dispute that Massachusetts law governs this
contract.  The parties also do not dispute that a representative
of LimoLiner told Dattco on May 30, 2011 -- prior to Liner 3001's

- 11 -

transfer to Dattco's facilities -- that LimoLiner wanted the vehicle to be repaired "as soon as possible." The question, therefore, is whether that statement made expedited performance a term of the oral contract between the parties.

The parties agree that under Massachusetts law this question is one of fact, see Rizzo v. Cunningham, 20 N.E.2d 471, 474 (Mass. 1939); RCI Northeast Servs. Div. v. Boston Edison Co., 822 F.2d 199, 202 (1st Cir. 1987) ("[W]here the plain meaning of a contract phrase does not spring unambiguously from the page or from the context, its proper direction becomes one for the factfinder, who must ferret out the intent of the parties.") (applying Massachusetts law), and that we must review the Magistrate Judge's finding only for clear error. See Fed. R. Civ. P. 52(a)(6). We find none.

The Magistrate Judge did note that "[i]n other contexts, phrases such as 'as soon as possible' and 'as soon as practicable' have been construed to mean 'as soon as reasonably possible under the circumstances of the case.'" LimoLiner, 2014 WL 4823877, at *5. But the Magistrate Judge expressly found, in this instance, that "there was no agreement that the repairs would be performed on an expedited basis." Id. The Magistrate Judge reasoned as follows.

The Magistrate Judge found that there was "no evidence that LimoLiner ever told Dattco that it needed [Liner 3001] by a

- 12 -

specific date or the reason why it needed it back as soon as possible." Id. at *5.  Consistent with that finding, the record shows that LimoLiner had not used Liner 3001 for its luxury transportation business for over a year by the time it contracted with Dattco for repairs.  The record also provides a basis for the Magistrate Judge's finding that Dattco understood "that Liner 3001 had been out of service for quite some time." Id. at *3.  In fact, the Dattco sales manager present at the May 30th meeting testified that "[b]ecause [Liner 3001] had been down for so long . . . [he] didn't believe there was any urgency, no one had told [him] about any urgency."

As a result, the Magistrate Judge did not clearly err in treating LimoLiner's single oral request for performance "as soon as possible" to be a perfunctory suggestion rather than a manifestation of a mutually agreed upon term of expedited performance.[2]  See Murphy v. Nelson, 27 N.E.2d 678, 679 (Mass. 1940) (holding that an oral conversation regarding the terms of an agreement "could be found not to have been intended by the parties to be a part of their [ultimate] agreement," as it "was no more than an expression of an opinion or suggestion concerning the

---

[2] Although LimoLiner repeatedly renewed its request for expedited performance after work on Liner 3001 was well underway, LimoLiner does not contend -- nor could it reasonably contend -- that these subsequent requests were part of the parties' original contract or that they modified the parties' contract.

- 13 -

transaction into which the parties contemplated entering"); cf. Rezendes v. Barrows, No. CIV. A. B96-01625, 1998 WL 470505, at *12 (Mass. Super. Aug. 11, 1998) (holding that a written brokerage agreement did not include an expedited term of performance because the agreement contemplated a definite result and lacked an explicit expiration date, even though the broker knew that the borrowers were "seeking funds as soon as possible").  We therefore reject LimoLiner's first challenge.

**B.**

LimoLiner next argues that even if there was no agreement to expedite the repair work, Dattco still failed to perform the repairs within a reasonable period of time.  LimoLiner first contends that the Magistrate Judge erred by failing to make a finding on this score at all.  LimoLiner then contends that, to the extent the Magistrate Judge did find that Dattco's performance was timely, the Magistrate Judge committed clear error in so finding.

Under Massachusetts law, if a contract is silent as to the term for performance, then "the term shall be a reasonable time based on all the relevant evidence."  See Bushkin Assocs. v. Raytheon Co., 815 F.2d 142, 146 (1st Cir. 1987); Thermo Electron Corp. v. Schiavone Const. Co., 958 F.2d 1158, 1164 (1st Cir. 1992) (in the absence of any specified time limit or provision stating that time was "of the essence," the term was "a reasonable time").

- 14 -

Contrary to LimoLiner's contention, the Magistrate Judge, applying that default term for performance, did find that Dattco performed within a reasonable time. See LimoLiner, 2014 WL 4823877, at *5 (finding that Dattco "did not breach the contract with regard to the timing of the repairs," as Dattco performed as soon as reasonably possible under the circumstances).

That being the case, LimoLiner agrees that a finding about "reasonable" timely performance is one of fact and is thus "subject to the clearly erroneous standard of Fed. R. Civ. P. 52(a)." See Hammond v. T.J. Litle & Co., Inc., 82 F.3d 1166, 1177 (1st Cir. 1996) (applying Massachusetts law). And, once again, we find no clear error.

The reasonableness of Dattco's twelve-week period of performance -- extending from May 31, 2011 to August 25, 2011 -- "depends on the nature of the contract, the probable intention of the parties as indicated by it, and the attendant circumstances." Charles River Park, Inc. v. Bos. Redevelopment Auth., 557 N.E.2d 20, 32 (Mass. App. Ct. 1990). The Magistrate Judge supportably found that those considerations weighed in favor of finding that Dattco had performed within a reasonable time.

In addition to finding that Liner 3001 had been out of service for some time, the Magistrate Judge found that Liner 3001 was missing a number of critical parts and thus needed significant repair work, the extent of which was originally unforeseen by the

- 15 -

parties.[3]  The Magistrate Judge also found that LimoLiner did not express an urgent need to have Liner 3001 repaired until after another Liner -- Liner 3000 -- had been badly damaged in late June 2011.  The record provides sufficient support for each of these findings.

LimoLiner does contend that the Magistrate Judge failed to take into consideration certain of Dattco's actions (or non-actions) when determining whether Dattco acted within a reasonable time.  For example, LimoLiner points to record evidence that Dattco did not begin work on Liner 3001 until June 9, 2011, or nine days after it acquired possession of the vehicle.  LimoLiner also contends that the record shows that, as of July 28, 2011, Dattco had performed only 62.2 hours of work on Liner 3001, as Dattco averaged a little over one hour per day in the first eight weeks (even though Dattco had mechanics working twenty-four hours per day).  LimoLiner further contends, based on certain testimony adduced at trial, that Dattco was generally not busy during the twelve-week period.

---

[3] A sales manager for Dattco testified that "[t]here were body parts missing off the engine [of Liner 3001].  In the electrical compartment we could see evidence of a fire and smell evidence of a fire."  A work supervisor at Dattco further testified that "there w[ere] several obvious defects with the vehicle.  Lights, body panels missing, it appeared it hadn't run in quite some time.  Batteries were dead.  There was one of two alternators I believe were seized up on the vehicle."

But the Magistrate Judge referenced the fact that Dattco did not begin work on Liner 3001 until June 9, 2011 and that Dattco spent only 62.2 hours working on Liner 3001 as of July 28, 2011.[4] The Magistrate Judge just gave that evidence little weight in view of "the nature of the contract, the probable intention of the parties as indicated by it, and the attendant circumstances." Charles River Park, Inc., 557 N.E.2d at 32. For example, in considering the circumstances bearing on the timeliness of the repairs, the Magistrate Judge reasonably gave weight to the "evidence that once some repairs were performed, new problems were found that had to be addressed." LimoLiner, 2014 WL 4823877, at *5.

Perhaps this record could be read to permit a different finding. But that possibility does not suffice to show that the Magistrate Judge clearly erred in finding as she did. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 574 (1985); cf. Thermo Electron Corp., 958 F.2d at 1165-66 (where there was strong evidentiary support in the record to support the conflicting notions that a

_____

[4] The Magistrate Judge, as factfinder, was entitled to credit testimony that Dattco worked on Liner 3001 "as available man hours allowed" over testimony that Dattco was not particularly busy during the relevant time period and therefore could have devoted many more hours to repairing Liner 3001.

party had and had not repudiated contract, the appellate court deferred to the district court's finding that there was no repudiation). We thus affirm the Magistrate Judge's finding that Dattco did not breach its oral contract with LimoLiner with respect to the timeliness of repair.

**IV.**

LimoLiner's final contention is that we must reverse the Magistrate Judge's award of damages because it accounted for only a portion of the time in which LimoLiner was without the use of Liner 3001 and thus was too limited. Here, too, the issue is one of fact, and our review is for clear error. See Fed. R. Civ. P. 52(a)(6); Twin Fires Inv., LLC v. Morgan Stanley Dean Witter & Co., 837 N.E.2d 1121, 1135 (Mass. 2005) (noting that "the amount of damages awarded is a factual issue"); Thermo Electron Corp., 958 F.2d at 1166. And here, too, we affirm.

There were three periods of time during which LimoLiner was without the use of Liner 3001. The first period ran from May 31, 2011 to August 25, 2011, when Dattco was performing repairs on the vehicle. The second period ran from August 25, 2011 to October 12, 2011, when Dattco was holding Liner 3001 pending payment for the services performed. The third period ran from October 12, 2011 to November 11, 2011, when LimoLiner had possession of Liner 3001 and during which period LimoLiner made arrangements to obtain and replace the inverter.

LimoLiner argued below that it was entitled to damages for a four-month loss of use of Liner 3001 -- spanning from July 2011 (middle of the first period) to October 2011 (middle of the third period) -- due to Dattco's alleged delay in performance and Dattco's failure to perform all the requested repairs. The Magistrate Judge disagreed. The Magistrate Judge declined to award damages to LimoLiner for any portion of the first and second periods of time. Indeed, the Magistrate Judge awarded damages to LimoLiner for only a portion of the third period of time. See LimoLiner, 2014 WL 4823877, at *10 n. 10 (noting that LimoLiner bore responsibility for a one-week delay during the third period of time and thus "attribut[ing] a three-week delay and corresponding damages to Dattco's conduct" during that four-week period (emphasis added)).

On appeal, LimoLiner accepts the Magistrate Judge's award of damages to LimoLiner for only a portion of the third period of time. But LimoLiner challenges the Magistrate Judge's refusal to award damages for the first and second periods of time. Specifically, LimoLiner contends that it was entitled to damages for the loss of use of Liner 3001 during a portion of the first period and all of the second period.

The Magistrate Judge declined to award damages to LimoLiner for the first period in light of her finding that Dattco performed within a reasonable time. Because we affirm the

- 19 -

Magistrate Judge's finding of timeliness and because, as LimoLiner implicitly concedes, only a contrary finding would have supported an award of damages to LimoLiner during the first period, the Magistrate Judge did not clearly err in withholding damages for the entire first period of time.

As to the second period of time, Massachusetts law has long made clear that a prevailing party may be awarded damages only to the extent those damages are attributable to breaches or misconduct by the opposing party.  See Stratton v. Posse Normal Sch. of Gymnastics, 163 N.E. 905, 905 (Mass. 1928) ("Damages not directly traceable to the violation of the contract or which result from other causes are not allowed.").  And LimoLiner has the burden of establishing that the damages it suffered from the loss of use of Liner 3001 during the second period were proximately caused by Dattco's misconduct.  See Augat, Inc. v. Aegis, Inc., 631 N.E.2d 995, 997 (Mass. 1994) ("The plaintiffs had to show the portion of [the company's] losses . . . that was attributable to the defendants' misconduct.").

In other words, LimoLiner must show that the damages it sustained during the second period were proximately caused by the misconduct that the Magistrate Judge did attribute to Dattco -- that is, Dattco's failure to repair the inverter.  But this LimoLiner has not done.  For while LimoLiner makes two arguments

- 20 -

on appeal as to why it ought to have been awarded damages for the second period, both arguments amount to nonsequiturs.

LimoLiner first contends the Magistrate Judge's finding that LimoLiner did not fail to mitigate damages during the second period indicates that LimoLiner should in fact have been awarded damages for that period. But LimoLiner's conduct is immaterial to the inquiry, as the relevant question is whether Dattco's misconduct proximately caused the damages sustained during the second period. LimoLiner next contends that the Magistrate Judge erroneously based her decision to withhold damages for the second period on her finding that Dattco did not breach the parties' contract in regard to timeliness. But the Magistrate Judge gave no indication that she considered Dattco's timeliness in declining to award damages to LimoLiner for the second period.

In consequence, LimoLiner has not demonstrated that the Magistrate Judge clearly erred in awarding damages in the limited manner that she did for the breach that she found. And, we note, the record provides support for finding that Dattco had a basis for holding onto Liner 3001 during the second period that was unrelated to the breach that had been found. In concluding that LimoLiner was not entitled to damages for replevin, the Magistrate Judge found that Dattco lawfully retained possession of Liner 3001 during the second period pursuant to the Massachusetts Garage Keepers statute. See Mass. Gen. Laws ch. 255, § 25. And that

finding supports Dattco's contention that the loss of use of Liner 3001 was driven by a reasonable payment dispute between the parties and thus that the Magistrate Judge did not clearly err in awarding damages as she did.

## V.

For the reasons above, we affirm the Magistrate Judge's disposition of the parties' state law contract claims.  But we certify the question regarding 940 C.M.R. § 5.05 to the Supreme Judicial Court of Massachusetts in accordance with the directions set forth above.